# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

TERRELL K. ELEBY,

                               Plaintiff,

   vs.                                                 9:14-CV-1468 (GTS/ATB)

HAROLD GRAHAM, et al.,

                               Defendants.

---

TERRELL K. ELEBY, Plaintiff pro se
ADRIENNE J. KERWIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). On October 28, 2014, defendants removed this action from the New York State Supreme Court, Cayuga County. (Dkt. No. 1). In his amended civil rights complaint, plaintiff, a practicing member of the Nation of Islam ("NOI") and an inmate at Auburn Correctional Facility ("Auburn"), alleges that defendants violated his First Amendment right to practice his religion and his rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc-1(a) by interfering with his observance of the holy month of Ramadan during a facility-wide lockdown from July 29, 2013 through August 4, 2013. (Dkt. No. 12, Am. Compl. at CM/ECF pp. 8-9). In his amended complaint, plaintiff seeks declaratory and monetary relief. (Am. Compl. at CM/ECF p. 14).

Presently before the court is the defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56. (Dkt. No. 41). Plaintiff has responded in opposition to the motion. (Dkt. No. 43). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

## DISCUSSION

### I. **Facts and Contentions**[1]

In 2013, the Muslim holy month of Ramadan took place from July 8 to August 7. (Dkt. No. 41-4, Graham Decl. ¶ 14). During this period, plaintiff, as a member of the NOI, had certain spiritual obligations: (1) to fast from sun up to sundown; (2) to congregate at sundown with other members of the community for prayer and a communal Halal[2] meal; (3) to consume the contents of a Sahor bag[3] before sunrise; and (4) to engage in Wahu, a ritualistic washing, prior to prayer. (Dkt. No. 41-3, Pl.'s Dep. at 15-24). During his deposition, plaintiff described Ramadan as a time for spiritual renewal, and an opportunity for him to identify his personal flaws and strive to conquer

---

[1] As required under L.R. 7.1, defendants have filed a statement of material facts and notice to plaintiff of the requirement to file a response in accordance with the local rules. (Dkt. No. 41-9). Because plaintiff has failed to respond in the manner required by L.R. 7.1(a)(3), the court may accept the facts in defendants' statement as true to the extent that they are supported by evidence in the record. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, in deference to plaintiff's pro se status, this court has opted to review the entire summary judgment record to determine the relevant facts.

[2] At his deposition, plaintiff explained that Halal food has been slaughtered and prepared in accordance with Islamic law. (Dkt. No. 41-3, Pl.'s Dep. at 17-19).

[3] Plaintiff testified that the Sahor bag contained a meal to be consumed in the early morning prior to the daily fast, typically at 3 or 4 a.m. It consisted of cereal, wheat bread, milk, and either eggs or cheese. (Pl.'s Dep. at 20-21). Other sources have referred to this meal as "Sahur," *see e.g., Shakur v. Graham,* Case No. 9:14-cv-427 (MAD/TWD), 2015 WL 1968492, at *9 (N.D.N.Y. May 1, 2015) (citation omitted), but this court will adopt the spelling used by both parties.

2

them. (*Id*. at 11-12).

From July 8, 2013 through the evening of July 28, 2013, the inmates at Auburn were provided hot halal meals to break their fast, Sahor bags to eat prior to sun up, an opportunity to shower, and permission to congregate in a designated room. (*Id*. at 10). On July 29, 2013, Auburn Superintendent Harold Graham, a named defendant, instituted a lockdown order so that security staff could conduct a facility-wide frisk for contraband. (Graham Decl. ¶ 20). The lockdown order was issued with the permission of New York State Department of Corrections and Community Supervision ("DOCCS") Deputy Superintendent Joseph Bellnier. (Graham Decl. ¶ 13). During the lockdown, all inmate movement within the facility ceased. (*Id*. ¶ 7). No inmate programs were run, no religious ceremonies or congregate prayer services were held, and inmates remained confined to their cells for all meals. (*Id*. ¶ 8). There were only three exceptions: movement to a "clean cell" for urinalysis testing; escorts to the infirmary for insulin injections; and previously scheduled family visits. (*Id*. ¶¶ 9-12). The lockdown lasted from approximately 2 p.m. on July 29, 2013 until 1:45 p.m. on August 3, 2013. (*Id*. ¶ 20).

Because of the lockdown, plaintiff was not permitted to meet for communal meals or prayer with fellow NOI inmates. (*Id*. ¶ 21). He was also not provided the customary hot halal meal to break his fast at sun up. (*Id*. ¶ 22). Instead, Auburn provided the same bagged meal three times a day to all inmates, regardless of religious affiliation. (Dkt. No. 41-5, Martin Decl. ¶¶ 7-9). These meals, which had been approved by the DOCCS Office of Nutritional Services, contained non-pork meat,

3

cheese, condiments, fruit or a cookie, bread, and juice. (Martin Decl. ¶ 8). Sahor bags were provided on the first day of the lockdown, but after that, plaintiff was expected to use one of the bagged meals as a substitute. (Pl.'s Dep. at 19-21). Due to the movement restrictions, no inmates were allowed to use the showers. (Pl.'s Dep. at 22-23). Hot water was distributed to inmates to wash in their cells only after the frisk of their cell block was completed. (Graham Decl. ¶ 24). When the lockdown was fully concluded on August 3, plaintiff was able to resume his traditional observance of Ramadan for the remainder of the holy month. (Am. Compl. ¶ 3).

## II. <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts

showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## III. Religion Claims

### A. Legal Standards

#### 1. First Amendment

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An

5

individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford*, *supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[4] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016)

---

[4] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

6

(discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### 2. Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has

7

been burdened and that the burden is substantial.[5] *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007) (citing, *inter alia, Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (discussing First Amendment protections).

---

[5] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

### B. Application

#### 1. First Amendment

For purposes of this motion only, defendants have not disputed plaintiff's contention that the lockdown's interference with his observance of Ramadan substantially burdened his ability to practice his religion. (Dkt. No. 41-10, Def.'s Br. at CM/ECF pp. 6-7). Rather, they argue that (1) defendant Morris was not personally involved in the alleged violation; (2) any burden was reasonably related to legitimate penological interests and in furtherance of the compelling governmental interest of prison security; and (3) qualified immunity would prevent the assessment of damages against defendants Martin, Morris, Robinson, and Thomas.[6]

##### a. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant

---

[6] Defendants Martin, Morris, Robinson, and Thomas argue that they are entitled to qualified immunity, because they had no input into the development or implementation of the lockdown order, and were either unaware of the lockdown order at the time it was implemented or were following what they believed to be a lawful order. (Dkt. Nos. 41-5, Martin Decl. ¶ 12; Dkt. No. 41-6, Morris Decl.¶ 5; Dkt. No. 41-7, Robinson Decl. ¶ 9; and Dkt No. 41-8, Thomas Decl. ¶ 7). This court need not address this issue because I find that the lockdown did not violate plaintiff's First Amendment rights, and plaintiff's RLUIPA claims are moot. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If the defendants have not violated the plaintiff's rights in the first instance, the court need not reach the issue of whether a reasonable person would have known of the violation.

can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not

alleged the requisite personal involvement of defendant Morris so that any damages may be assessed against her.

Personal involvement requires that the individual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. *See Conklin v. City of Suffolk*, 859 F. Supp. 2d at 441-42 (personal involvement requires knowledge and the ability to take action). In this case, plaintiff argues that defendant Morris, as DOCCS Director of Ministerial, Family, and Volunteer Services, failed to ensure that plaintiff received "his fasting meal and such to aid him in enjoying a successful and spiritual Ramadan." (Am. Compl. at CM/ECF p. 13). Plaintiff testified at his deposition that he had never contacted defendant Morris about the interference with Ramadan, and did not know whether she was aware of the lockdown when it was imposed.[7] (Pl.'s Dep. at 42). Defendant Morris stated in her declaration that she was not normally advised of lockdowns that could impact religious holy days, and did not recall being advised of the lockdown at Auburn between July 29, 2013 and August 3, 2013. (Dkt. No. 41-6, Morris Decl. ¶¶ 4-5). Even if she had been advised, defendant Morris had no authority to overrule or interfere with its implementation. (Morris Decl. ¶ 11). Accordingly, defendant Morris had no personal involvement in the alleged First Amendment violation, and the claim against her should be dismissed.

### b. Legitimate Penological Interest

Assuming that plaintiff's sincerely held religious beliefs were substantially

---

[7] The deposition transcript incorrectly identifies defendant Morris as "Sarah Ward," but plaintiff is clearly discussing "the person that is in charge of the ministry in Albany." (Pl.'s Dep. at 41-42).

11

burdened, the court must consider whether defendants meet the "relatively limited burden" of identifying the legitimate penological interests that justified the lockdown and resulting interference with Ramadan. *Salahuddin*, 467 F.3d at 275 (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127–28 (1977) (prison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof)). Once a legitimate penological interest is articulated, its reasonableness is then subject to the *Turner* analysis. *Sproul v. Goord*, No. 9:05-CV-75, 2007 WL 2609787, at *11 (N.D.N.Y. Sept. 5, 2007).

Defendants justified the security need for the lockdown and facility-wide frisk, and its timing during the holy month of Ramadan, by citing the increase in security incidents at the facility in June and July 2013. Between June 22, 2013, and July 29, 2013, there were seven assaults on Auburn staff, eleven assaults on inmates, twenty-one fights between inmates, twelve weapons recovered, and twelve documented uses of force by Auburn staff. (Grahm Decl. at ¶ 13, Dkt. No. 41-7, Robinson Decl. at 17). Defendants compared this to data which showed that there had been only one assault on staff, three assaults on inmates, two weapons recoveries, and two documented uses of force during the immediately previous twenty day period from June 1, 2013 through June 21, 2013. (*Id.*). Defendant Graham's request to DOCCS Deputy Commissioner Bellnier (who is not named as a defendant in this case) for permission to order a lockdown was approved on July 29, 2013, and the lockdown was implemented that afternoon. (Graham Decl. ¶ 18).

In explaining his lockdown order, defendant Graham stated that "[t]he presence

12

of contraband within a facility and its subsequent possession and/or use by inmates threatens the security of the facility, endangers the safety of inmates, employees, visitors, and the community, and impairs rehabilitation programs. (Graham Decl. ¶ 4). The discovery of "contraband and other potentially dangerous items" has been recognized as a "clearly legitimate objective" for prison officials. *Lewis v. Zon*, 920 F. Supp. 2d 379, 385 (W.D.N.Y. 2013).

This court agrees with defendants that the lockdown had a legitimate, rational connection to the governmental objective of reducing contraband and enhancing prison security. Defendant Graham explained in his declaration that "[t]he purpose of halting inmate movement is to ensure that the facility can be properly and thoroughly searched without the distraction of the normal operation of the facility, to eradicate the ability of inmates to move or eliminate contraband they have concealed in facility areas or living quarters, and also to make security staff available to conduct the facility wide frisk." (Graham Decl. ¶ 7).

Defendant Graham recognized that the lockdown would interfere with the observance of Ramadan, but believed that the intrusion was justified under the circumstances. (Graham ¶ 20). Fully accommodating the observance of Ramadan would have either required postponing the frisk despite the perceived need for an immediate response, or delaying completion of the frisk by diverting staff. Prison officials are entitled to "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547

13

(1979). "In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts." *Hurley v. Ward,* 549 F.Supp. 174, 184 (S.D.N.Y.1982) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977); *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

Defendants provided plaintiff with an alternative, albeit incomplete, means of meeting some of his Ramadan obligations while confined to his cell. (Graham Dec. ¶¶ 17, 23). Plaintiff was provided bagged meals to break his fast, and to use as a substitute for the traditional Sahor bag. (Graham Dec. ¶ 17). Once the search of plaintiff's cell block was complete, he was also provided hot water. (Graham Dec. ¶ 24).

Plaintiff has failed to raise any material question of fact regarding the rationality of defendants' implementation of the lockdown, or proposed any viable alternatives that would not adversely impact staff, inmates, and prison resources. First, plaintiff questions the need for the lockdown at all, and argues that the alleged security emergency was "nothing but a ploy" to justify the unprofessional decision to interfere with the observance of Ramadan. (Dkt. No. 43, Pl.'s Br. at CM/ECF p. 6). Plaintiff testified that he based this conclusion on "word of mouth and having conversations with different people," who told him that there "was no type of violence going on . . . . [t]here was no particular plot to over throw the jail or anything of that nature." (Pl.'s Dep. at 31). The fact that plaintiff was unaware of any increase in violent incidents does not create an issue of fact regarding defendants' security concerns. *See DeJesus v. Bradt*, Case No. 6:13-CV-6066 EAW, 2016 WL 1266652, at *9-10 (W.D.N.Y. Mar. 31,

14

2016) (policy that banned the removal of food from the mess hall during Ramadan could not be deemed irrational merely because plaintiff was unaware of security problems caused by the practice); *Jermosen v. Coughlin*, No. 87 Civ. 6267 (RJW), 1993 WL 267357, at *4 (S.D.N.Y. July 9, 1993) (mere fact that plaintiff lacked personal knowledge of perceived security risk was not evidence of its nonexistence); *see also Seymour/Jones v. Vaughn*, Civ. A. No. 89-8087, 1991 WL 195737, at *1 (E.D. Pa 1991) ("In order for a decision to lock down a prison to be reasonable, the prison authority must believe that a valid prison purpose exists for the lock down, and not simply be acting out of spite or malice. It is not necessary for his information to, with the clarity of 20-20 hindsight, turn out to have been true.").

At his deposition, plaintiff conceded that the lockdown would have been "understandable" if there had been an emergency, because "[s]ecurity supersedes all things in an emergency." (Pl.'s Dep. at 31). Even if that were the case, plaintiff contends that the facility-wide frisk should have been conducted in a manner that reduced its impact on NOI and other Muslim inmates. (Pl.'s Br. at CM/ECF p. 5). Specifically, plaintiff argues that facility staff should have inspected the cells of Muslim inmates who worked in the kitchen as soon as possible. (*Id.*). These inmates could then have prepared the halal food, which had already been purchased for Ramadan. (*Id.*).

Plaintiff's suggested alternative would have increased inmate movement in the facility, negatively impacting security staff and kitchen employees, and likely prolonging the duration of the lockdown . As explained by defendant Graham, the

purpose of restricting inmate movement is to allow an efficient and thorough search "without the distraction of the normal operation of the facility." (Graham Decl. ¶ 7) Defendant Martin also explained that during the lockdown, the kitchen "operated with minimal civilian staff." (Martin Decl. at 11). Therefore, even if Auburn were able to prioritize the cell inspection of Muslim inmates who could prepare the halal food, staff resources would necessarily be diverted each day to escort those inmates to the kitchen and to monitor them while they prepared the alternative meals. This diversion of security staff from the facility-wide frisk, and re-structuring of existing lockdown protocols, would have more than a *de minimis* impact on prison operations. Because defendants have demonstrated a legitimate penological purpose for the burden imposed on plaintiff's First Amendment rights, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's First Amendment claims.

### 2. RLUIPA

To the extent that plaintiff asserts RLUIPA claims against any of the defendants in either their individual or official capacities, the claims should also be dismissed. In his Amended Complaint, plaintiff seeks declaratory and monetary relief.[8] However, RLUIPA does not authorize claims for money damages against state officers in either their individual or official capacities. *Holland*, 758 F.3d at 224. Although a plaintiff could ordinarily pursue claims for declaratory relief under RLUIPA against defendants in their official capacities, plaintiff is no longer incarcerated at Auburn. He notified the

---

[8] Plaintiff has emphasized that he is not seeking injunctive relief under RLUIPA. (Pl.'s Br. at CM/ECF p. 9).

court that he had been transferred to the Sing Sing Correctional Facility, effective May 16, 2016. (Dkt. No. 44). His transfer to another facility moots claims for declaratory or injunctive relief against Auburn officials. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (citing *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)); *see also Wright v. New York State DOCCS,* 568 F. App'x 53, 55 (2d Cir. 2014); *Wood v. Captain Colon*, No. 3:13-CV-1467, 2016 WL 2930882, at *3 (D. Conn. May 18, 2016).

If plaintiff had named an individual who had authority to change state-wide policy regarding lockdowns during religious holidays, it is possible that his RLUIPA claim would not be moot as to that individual in his or her official capacity. *See Smith v. Artus*, 522 F. App'x 82, 84 (2d Cir. 2013) (finding that plaintiff's transfer to a new facility did not render moot his claims for injunctive and declaratory relief under the First Amendment or RLUIPA when plaintiff was subjected to the same policy banning inmate demonstrative prayer in the recreation yard at his new facility, and there was a state-wide policy banning such conduct). With the exception of defendant Morris, plaintiff has sued only officials at Auburn. Morris, who is the DOCCS Director of Ministerial, Family and Volunteer Services, has no authority to change statewide policy regarding lockdowns during religious holy days. (Morris Decl. ¶ 11). Even if plaintiff could have pursued a claim for declaratory or injunctive relief, the claim would still be moot as against the only defendants that he has named. Thus, the entire complaint may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

41) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 21, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge